IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| RICHARD HUFF | § | |
|     TDCJ NO. 1475093 | § | |
| | § | |
| v. | § | C.A. NO. C-07-426 |
| | § | |
| DR. QUAZI IMAM | § | |

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

In this civil rights action, plaintiff Richard Huff claims that Dr. Quazi Imam was deliberately indifferent to his serious medical needs when he altered his medication regimen while he was confined in the Nueces County Jail. (D.E. 1). Defendant moves for summary judgment to dismiss plaintiff's claims. (D.E. 32). For the reasons stated herein, defendant's motion is granted, and plaintiff's claims against Dr. Imam are dismissed with prejudice.

**I.      Jurisdiction.**

The Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331. Upon consent of the parties (D.E. 11, 37, 38 and 39), this case was referred to the undersigned magistrate judge to conduct all further proceedings, including entry of final judgment. (D.E. 40). See 28 U.S.C. § 636(c).

**II.     Procedural background and plaintiff's allegations.**

Plaintiff is an inmate in the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-CID), and is currently incarcerated at the Eastham Unit in Lovelady, Texas, although his complaint concerns events that occurred while he was at the

Nueces County Jail in Corpus Christi, Texas. He filed this civil rights action on November 2, 2007, alleging that Dr. Quazi Imam, the contract psychiatrist for the Nueces County Jail, was deliberately indifferent to his serious medical needs because he made changes to plaintiff's medication regime. (D.E. 1). In particular, he claims that Dr. Imam discontinued his Seroquel and Ativan, while prescribing him Lithium and Mellaril for his bipolar disorder.

A Spears[1] hearing was held on November 28, 2007, following which service was ordered on Dr. Imam. (D.E. 17). On April 10, 2008, Dr. Imam filed his answer, and raised the defense of qualified immunity. (D.E. 20).

On December 11, 2008, Dr. Imam filed the instant motion for summary judgment. (D.E. 32). On December 22, 2008, plaintiff filed objections to the summary judgment motion (D.E.33), and on December 29, 2008, defendant filed a reply to plaintiff's objections. (D.E. 34).

**III. Summary judgment evidence.**

In support of his motion for summary judgment, Dr. Imam offers, *inter alia,* copies of plaintiff's medical records from Nueces County Jail (DX-C), Nueces County MHMR (DX-J) and the TDCJ (DX-K). In addition, Dr. Imam offers his own affidavit, (DX-D), as well as the affidavits of Dr. Daniela Badea-Mic, plaintiff's private psychiatrist who treated him for many years prior to his incarceration (DX-E), and Dr. Christopher Ticknor, a

---

[1] Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985); see also Eason v. Holt, 73 F.3d 600, 603 (5th Cir. 1996) (stating that testimony given at a Spears hearing is incorporated into the pleadings).

psychiatrist who specializes in mental health and mental illness. (DX-F). See D.E.32, attached exhibits.[2]

The evidence establishes the following facts:

On February 9, 2007, plaintiff was seen at the Nueces County Jail for his initial medical screening.[3] (DX-C at Bates No. 6-10). Plaintiff's medical history was positive for Bipolar Disorder, Insulin-Dependent Diabetes, Sleep Apnea and Hepatitis C. Id. at 6, 41. Plaintiff reported that he was currently taking Lorazapam, an anti-anxiety medication, Lithium, an anti-psychotic mood stabilizer, and Seroquel, a mood stabilizer, for his bipolar disorder and attendant mood disorder. Id. at 11, 41.

On February 12, 2007, plaintiff met with Dr. Imam for an evaluation of his bipolar disorder and medications. (DX-C at Bates No. 40). Plaintiff related that he had been a patient with the Texas MHMR and had been stable while on his medications. Id. Dr. Imam noted that plaintiff was "angry, uncooperative, and irritable," and his diagnostic impression was bipolar disorder, polysubstance dependence disorder, and antisocial personality disorder. Id. He continued plaintiff on Lithium, 300mg in the morning and 600mg in the evening, and

---

[2] Reference to defendant's summary judgment motion, (D.E. 32), is to "DX" followed by the appropriate exhibit letter and page reference. Reference to plaintiff's response, (D.E. 33) is to "PR."

[3] The Fifth Circuit has held that "the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care ..., during their confinement." Hare v. City of Corinth, 74 F.3d 633, 650 (5th Cir. 1996). Thus, regardless whether plaintiff was a pretrial detainee or a convicted prisoner, the standard of liability is the same for episodic acts or omissions of jail officials that expose an inmate to harm. Id.

ordered a lithium level evaluation for February 19, 2007, to ensure that the lithium serum level was within normal limits.  Id.  Additionally, Dr. Imam replaced plaintiff's Seroquel with 50mg of Mellaril, twice per day.  Id.  He discontinued the Ativan.  Id.  Finally, Dr. Imam ordered 15-minute checks on plaintiff due to his history of self-harm, including intentional overdose.  Id.

On March 8, 2007, plaintiff submitted an Inmate Communication Form "ICF") complaining of nasal congestion which he attributed to the Mellaril.  (DX-C at Bates No. 119).  Plaintiff requested that he be prescribed Trazodone.  Id.  A psychiatric evaluation was scheduled.  Id.

On March 9, 2007, plaintiff met with Dr. Imam.  (DX-C at Bates No. at 54).  Plaintiff admitted that he had not been compliant with the Mellaril.  Id.  Plaintiff denied hallucinations or suicidal ideation, and Dr. Imam concluded that the Mellaril was not causing any acute side effects.  Id.  He continued plaintiff on the Lithium and Mellaril.

On March 16, 2007, plaintiff submitted an ICF again requesting Trazodone.  (DX-C at Bates No. 117).  On March 19, 2007, plaintiff was seen by Dr. Imam.  Id. at 51.  Dr. Imam found plaintiff to be compliant with his medications and stable.  Id.  He prescribed plaintiff Trazodone, 50mg at night, to help with his sleeplessness.  Id.

On June 16, 2007, plaintiff began experiencing difficulty sleeping and complained of hallucinations.  (DX-C at Bates No. 111).[4]  On June 18, 1997, Dr. Imam evaluated plaintiff,

---

[4] Plaintiff had also complained of manic episodes and hallucinations while he was on Seroquel.  (DX-J at Bates No. 126, 213).

and determined that he was stable. Id. at 42. Dr. Imam continued plaintiff on his medications.

On June 29, 2007, plaintiff submitted an ICF complaining of sleeplessness and headaches, and requested that his Trazodone be increased. (DX-C at Bates No. 109). Dr. William Flores, the jail physician, prescribed Tylenol for his headaches. Id. at 241. On July 2, 2007, Dr. Imam increased the Trazodone dosage. Id. at 107.

On July 24, 2007, jail personnel reported that plaintiff was exhibiting increased agitation, and he had refused his insulin, medications, and fingersticks for blood monitoring. (DX-C at Bates No. 65). He was scheduled to see Dr. Imam, on placed on 15-minute watch. Id. Dr. Imam saw plaintiff later that day. Id. at 64. Plaintiff demanded that he be put back on the Seroquel, and stated that he would not comply with his diabetes treatment unless the Seroquel was prescribed. Id. Dr. Imam cautioned plaintiff about the risks associated with seroquel for diabetic patients. Id. In addition, because of plaintiff's refusal to comply with his diabetic medications, Dr. Imam placed him on a diabetic coma watch. Id. Further, Dr. Imam increased his Trazodone to 100 mg. Id.

On July 29, 2007, plaintiff submitted an ICF stating that he wanted Seroquel and requesting that his Trazodone be increased again. (DX-C at Bates No. 106).

On September 4, 2007, jail officials observed that plaintiff was in a depressive state. (DX-C at Bates No. 82). Dr. Imam noted that he was demonstrating new symptoms, including guarding, suspicion, and hallucinations. Id. Dr. Imam prescribed Seroquel and

placed him on a 30 minute watch.  Id.  Dr. Imam continued with quarter-hour observations through most of September.  Id. at 74-75.

Since his transfer to the TDCJ-CID, plaintiff has been continued on the Lithium, but the Seroquel was discontinued, nor has he been prescribed Ativan.  (See DX-K at 130-143).

**IV.    Summary judgment standard.**

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion.  Caboni v. Gen. Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence, or evaluate the credibility of witnesses.  Id.  Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e); see also Cormier v. Pennzoil Exploration & Prod. Co., 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987)

(per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions). Unauthenticated and unverified documents do not constitute proper summary judgment evidence. King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." Caboni, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." Anderson, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248.

## V.   Discussion.

### A.   Qualified Immunity.

Defendant claims entitlement to qualified immunity, and argues that he provided appropriate medical care and rendered it in good faith, such that plaintiff fails to state a constitutional violation.

The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Immunity in this sense means immunity from suit, not merely from liability.  Jackson v. City of Beaumont, 958 F.2d 616, 620 (5th Cir. 1992). "Qualified immunity is designed to shield from civil liability all but the plainly incompetent or those who violate the law."  Brady v. Fort Bend County, 58 F.3d 173, 174 (5th Cir. 1995). In general, "qualified immunity represents the norm."  Id.

The qualified immunity determination involves a two-step analysis: first, "'whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right.'"  Mace v. City of Palestine, 333 F.3d 621, 623 (5th Cir. 2003) (quoting Price v. Roark, 256 F.3d 364, 369 (5th Cir. 2001)).  If a constitutional violation is alleged, the Court must next determine "whether the right was clearly established – – that is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. at 624.  Once defendants have invoked the defense of qualified immunity, the burden shifts to plaintiff to show that the

defense is inapplicable. McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam).

### B.    Deliberate indifference to serious medical needs.

The threshold question in a qualified immunity analysis is whether a constitutional right would have been violated on the facts alleged. Saucier v. Katz, 533 U.S. 194, 200 (2001). Dr. Imam contends that plaintiff has failed to establish that he knew of a serious medical need and deliberately ignored or failed to treat that need, and that plaintiff failed to establish that Dr. Imam caused him any harm.

*Step 1 - Constitutional violation.*

Deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." Estelle v. Gamble, 429 U.S. 97, 105 (1976). "Deliberate indifference describes a state of mind more blameworthy than negligence"; there must be "more than ordinary lack of due care for the prisoner's interests or safety." Farmer v. Brennan, 511 U.S. 825, 835 (1994) (construing Estelle, 429 U.S. at 104). To establish an Eighth Amendment violation, an inmate must show that a prison official "act[ed] with deliberate indifference [and] exposed a prisoner to a sufficiently substantial risk of serious damage to his future health." Id. at 37.

A mere disagreement with the level and type of treatment is not actionable under the Eighth Amendment. Estelle, 429 U.S. at 107; Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997); Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995); Young v. Gray, 560 F.2d 201 (5th Cir. 1977). An incorrect diagnosis does not state an Eighth Amendment claim

because the deliberate indifference standard has not been met. Domino v. Texas Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001). A "plaintiff must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Id. (quoting Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985)). Delay in treatment may be actionable under § 1983 only if there has been deliberate indifference and the delay results in substantial harm. Stewart v. Murphy, 174 F.3d 530, 537 (5th Cir. 1999); Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993). Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference. Banuelos, 41 F.3d at 235.

   *Analysis.*

In his original complaint, plaintiff alleged that Dr. Imam was deliberately indifferent to his serious medical needs because Dr. Imam changed his bipolar medication regime. He argued that he had been on a medication regime consisting of Lithium, Trazodone, and Ativan while under the care of physicians at Texas MHMR, and that this combination of medications kept him stable. He charges that Dr. Imam changed his medications and caused him harm.

In support of his motion for summary judgment, Dr. Imam offers the affidavit of Dr. Ticknor, an expert in mood disorders, who has reviewed plaintiff's medical records and Dr. Imam's treatment of plaintiff and finds that Dr. Imam's "choice of medications and management of plaintiff's bipolar disorder was appropriate and met the standard of care in

10

providing evaluation, diagnosis, documentation, and treatment" during plaintiff's incarceration at Nueces County Jail.[5] (DX-F, Ticknor Aff't at 6). Dr. Ticknor states that, based on plaintiff's diagnosis of bipolar disorder and history of self harm, Dr. Imam's choice of Lithium, as the primary mood stabilizer medication, was appropriate because it, "is the only medication that has been proven to reduce the overall incidence of suicide in Bipolar patients." Id. at 6. Thus, Lithium offered both current and long-term benefits to plaintiff. Id.

In addition, Dr. Ticknor finds that Dr. Imam's substitution of Mellaril in place of the Seroquel was appropriate for a number of reasons. First, Mellaril is known to be safer for use with insulin-dependent diabetics, such as plaintiff. (DX-F, Ticknor Aff'r at 7). In addition, Mellaril has an added benefit of augmenting the stabilizing effects of the Lithium. Id. at 6. In comparison, Seroquel is more likely to lead to the development of complications with diabetes, and has a higher chance of causing more mania-promoting effects than does Mellaril. Id. at 7. Moreover, Seroquel and Ativan, because of their mood-altering effect, are more likely to be used as "currency" in prison, being traded for other items such as food or contraband. Id. Thus, within the context of plaintiff's diabetic condition and the prison setting, Dr. Ticknor opines that Mellaril, rather than Seroquel, was an appropriate choice in addition to plaintiff's Lithium. Id.

---

[5] Dr. Ticknor repeatedly characterizes Dr. Imam's treatment of plaintiff as meeting the "standard of care." (See DX-C, Ticknor Aff't at 4, 5, 6, 7, 9). However, "standard of care" as defined in state law medical malpractice cases, exists wholly independent from deliberate indifference to serious medical needs. See Golbert v. Caldwell, 463 F.3d 339, 349 (5th Cir. 2006).

Dr. Ticknor points out that, eventually, plaintiff began refusing all medications, including blood sugar monitoring and his CPAP machine for sleep apnea, in an attempt to force Dr. Imam to prescribe him Trazodone. (DX-F, Ticknor Aff't at 8). Plaintiff's psychiatric symptoms worsened, and so then Dr. Imam approved Seroquel. Id. Dr. Ticknor notes that plaintiff was frequently non-compliant with his medications, and that his medical file contains over a dozen specific "medical treatment refusal forms" documenting his refusal to cooperate with orders from Dr. Imam, as well as Dr. Flores and the nursing staff.[6] Id.

During plaintiff's incarceration at the Jail, his vital signs generally remained within normal limits. (DX-F, Ticknor Aff't at 9). The only exception was plaintiff's blood sugars which were a consequence of non-compliance with his diabetic diet. Id.

Dr. Ticknor concludes that plaintiff's mental health needs were evaluated on an ongoing basis, his symptoms were well documented, and that Dr. Imam and the medical team responded appropriately to those symptoms. (DX-F, Ticknor Aff't at 9). He testifies that there is no evidence that Dr. Imam neglected or ignored plaintiff's mental health needs. Id. at 10.

Plaintiff's former psychiatrist, Dr. Daniela Badea-Mic, the physician who prescribed him Seroquel prior to his incarceration, concurs with Dr. Ticknor that Mellaril was an appropriate medication to replace Seroquel.[7] (DX-E, Badea-Mic Aff't at 3). He notes:

---

[6] Plaintiff's refusal for medical treatment is evidenced in the record. See DX-C at Bates Nos. 15-19, 21-27, 43, 57, 63, 73, 83-86, 90-91, 95, 97, 101-104, and 307.

[7] Dr. Badea-Mic treated plaintiff from October 29, 2003 through 2005. (DX-E, Badea-Mic. Aff't at 2).

> The therapeutic effect of Mellaril is comparable to Seroquel. The difference [between] these bipolar medications is that Mellaril is considered to be a more suitable drug then Seroquel for patients with diabetes, as the risk of blood sugar increase, weight gain, and diabetic complications is less likely and the patient's blood sugar does not have to be monitored as closely.

DX-E, Badea-Mic Aff't at 3.

In addition, Dr. Badea-Mic testifies that Dr. Imam's decision to prescribe Trazodone to help with plaintiff's insomnia "was very appropriate and demonstrates [an] understanding and concern for Mr. Huff's wellbeing." DX-E, Badea-Mic Aff't at 34. Indeed, he notes that Dr. Imam readily increased plaintiff's Trazodone dosage when the initial dosage proved less than ideally effective. Id.

Dr. Badea-Mic notes that plaintiff's characterization of Dr. Imam withholding "my Seroquel," is "the type of agitation consistent with Mr. Huff's bipolar disorder, as well as his contemporaneous antisocial personality disorder." (DX-E, Badea-Mic Aff't at 4). He also approves Dr. Imam's decision to prescribe the Seroquel after plaintiff began to refuse all medical treatment unless he receiving it, ths placing the needs of the patient first. Id. at 3-4.

In addition, Dr. Badea-Mic states that, at no time was Mr. Huff ever in danger as a result of his not being prescribed Seroquel. (DX-E, Badea-Mic Aff't at 5). He concludes:

> In sum, Dr. Imam managed this very difficult patient's bipolar disorder very proficiently and never once demonstrated any indifference to his medical needs. Quite the contrary, actually; Dr. Imam admirably balanced Mr. huff's needs for psychiatric care while simultaneously watch-guarding over his diabetes.

Id.

Plaintiff's medical records demonstrate that his needs were not ignored or neglected. (See DX-C at Bates No. 36, 40, 42, 51, 64, 74-75, 82, 100, 105-107, 109,111, 119, 241). He was routinely seen and evaluated. Id. He was not suicidal, and was not demonstrating adverse side effects from his medicines. Id.

In his summary judgment response (D.E. 33), plaintiff argues that the affidavits of Dr. Imam and Dr. Badea-Mic are in conflict. (PR at 3). He points out that Dr. Badea-Mic testified that she changed him from Zyprexa to Seroquel because the Seroqual was not believed to raise blood sugar or cause weight gain. (DX-E at 2). However, Dr. Imam discontinued the Seroquel and switched to Mellaril "because Seroquel is more likely to lead to the development of complications with Mr. Huff's diabetes, including weight gain and increased blood sugar."

The fact that two medications, both Mellaril and Seroquel, are considered suitable for bipolar patients who suffer diabetes also, does not render the opinions of Dr. Imam and Dr. Badea-Bic in conflict. Indeed, Dr. Badea-Mic specifically states that Mellaril was the "benchmark" treatment for bipolar patients in the penal system and "is considered to be a more suitable drug than Seroquel for patients with diabetes, as the risk of blood sugar increase, weight gain, and diabetic complications is *less likely* and the patient's blood sugar does not have to be monitored as closely." (DX-E at 3). That is, ***within the penal system***, both doctors agree that Mellaril was the better choice because it, ***like*** Seroquel, did not have adverse side effects for diabetic patients ***and*** it had the additional benefit of not requiring as

14

much monitoring, *and* it was not considered "currency" within the prison.  Dr. Badea-Mic's testimony supports Dr. Imam's treatment of plaintiff with Mellaril.

In addition, Dr. Imam testified that he chose Mellaril because Seroquel has addictive qualities.  (DX-D, Imam Aff't at 8).  Based on plaintiff's history of substance abuse, Dr. Imam chose to terminate medications that carried a risk of contributing to his addiction.  Id.

Dr. Imam explained his primary concerns when working at the Jail:

> When I started working at Nueces County Jail [in] 2002, my main goal was to prevent suicide among inmates suffering from psychiatric complication[s], such as Mr. Huff.  before I started working there, there were at least 2-3 completed suicides per year at Nueces County Jail.  During my tenure with the Nueces County Jail, there were no completed suicides under my supervision.  Within three months of my departure from Nueces County Jail, there was one complete suicide by an inmate.  Due to the relatively high incidence of suicidality in the prison system, my goal with patients such as Mr. Huff is to manage their bipolar disease and mitigate the risk of suicide.  In Mr. Huff's case, this was particularly important due to a clinical history of attempted suicides and auditory hallucinations.

(DX-C at 4).  Dr. Imam's decision to prescribe Mellaril was appropriate and does not amount to deliberate indifference.

Plaintiff also argues that, even if Dr. Imam's initial decision to switch him to Mellaril was not deliberately indifferent, his failure to observe that the Mellaril was not working or to switch him back to Seroquel sooner renders his actions deliberately indifferent.  (PR at 5).  He claims that "[t]he issue is that even when he recognized the severe adverse effect his sudden change in medication was having on Plaintiff, he ignored it."  (PR at 5).  He argues

15

that Dr. Imam waited for him to have a "serious mental breakdown," before prescribing the Seoquel. Id.

Despite plaintiff's allegations, the undisputed evidence shows that plaintiff stopped taking *all* of his medications in an attempt to have Dr. Imam prescribe the Seroquel. There is no indication that the Mellaril alone caused plaintiff to experience suicidal thoughts or ideation, and, to the contrary, plaintiff denied such thoughts while taking the Mellaril as prescribed. (DX-C at 54, 117, 42). When plaintiff began complaining of sleep difficulties and hallucinations, Dr. Imam responded by increasing his Trazodone. Id. at 107. It was only after plaintiff began refusing the Mellaril and his other medications that his condition worsened. Id. at 65. At that point, Dr. Imam relented and prescribed the Seroquel to prevent any further deterioration in plaintiff's overall health. (DX-D, Imam Aff't at 4, 8-9) ("As a physician concerned about preventing a severe deterioration of Mr. Huff's mental and physical health, I re-started his Seroquel in the hopes of quelling his hallucinations and preventing injury associated with his noncompliance with his diabetes treatment.").

The summary judgment facts establish that Dr. Imam was not deliberately indifferent to plaintiff's serious needs. He monitored plaintiff's progress; replied timely and appropriately to plaintiff's ICF's; and agreed to certain changes in plaintiff's medication when asked or when necessary. His decision to replace plaintiff's Seroquel with Mellaril was based on his understanding of the medical literature and the advantages of certain medicines within the prison context. There is no evidence that Dr. Imam was aware of a serious medical need, and then ignored that need in deliberate indifference to plaintiff's

16

health and safety. Thus, plaintiff fails to state a constitutional violation against Dr. Imam, and Dr. Imam is entitled to summary judgment in his favor.

### *Step 2 – Objective reasonableness.*

For a right to be clearly established under the second step of the qualified immunity analysis, "[t]he contours of that right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). However, when the plaintiff fails to state a constitutional violation, as in this case, the Court need not examine whether the defendants' actions were reasonable. See Saucier, 533 U.S. at 201 (if the facts alleged do not establish that the officer's conduct violated a constitutional right, then the qualified immunity analysis need proceed no further and qualified immunity is appropriate).

In this case, plaintiff has failed to establish the violation of a constitutional right. Therefore, defendant Imam is entitled to the defense of qualified immunity. Saucier, 533 U.S. at 201.

## V.    Conclusion.

Dr. Imam has demonstrated that there is no genuine issue of material fact on the question of whether he was deliberately indifferent to plaintiff's serious medical needs, and his right to qualified immunity bars plaintiff's prosecution of this suit. Accordingly, Dr.

Imam's motion for summary judgment (D.E. 32) is granted. Plaintiff shall take nothing from Dr. Imam on his claims, which are dismissed with prejudice.

ORDERED this 3rd day of March, 2009.

_____
B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE